### WARD BAKING CO. v. HAZLETON BAKING CO.

(District Court, M. D. Pennsylvania. August 24, 1923.)

No. 316.

1. Patents ☜129—Infringer using patented composition and process cannot dispute utility.

Where one sued for infringement of patents on process in manufacture of bread and improvement in yeast-saving composition is using chemicals the use of which is covered by the patent and is striving to continue their use, it is in no position to dispute their utility.

2. Patents ☜112(3)—Burden on one attacking validity to show invalidity beyond reasonable doubt.

Grant of patents carries with them presumption of their validity and burden of disproving validity beyond a reasonable doubt rests on those attacking the patent.

3. Patents ☜328—1,148,328, for process in bread making, and 1,151,526, for yeast-saving composition, held valid.

The Kohman, Hoffman, and Godfrey patents, No. 1,148,328 for improved process in bread manufacture, and No. 1,151,526 for yeast-saving composition, containing potassium bromate, alone or in conjunction with certain salts, *held* valid.

4. Patents ☜26(2)—Not invalid as for aggregation when new and useful result produced by combination.

If combination produces new and useful results by reason of combined elements, and not merely aggregate of their several results, it is not unpatentable as an aggregation.

In Equity. Suit by the Ward Baking Company against the Hazleton Baking Company. Decree for plaintiff.

Knapp, O'Malley, Hill & Harris, of Scranton, Pa., and W. B. Morton, and R. McD. Allen, both of New York City, for plaintiff.

John H. Bigelow, of Hazleton, Pa., and Reed, Meals, Orgill & Maschke, of Cleveland, Ohio, for defendant.

WITMER, District Judge. This is the ordinary bill in equity for infringement of two patents of which the plaintiff is the owner by assignment. One of the patents, No. 1,148,328, was granted July 27, 1915, on the application of Henry A. Kohman, Charles Hoffman, and Truman M. Godfrey, as joint inventors, upon an improved process in the manufacture of bread; the other patent, No. 1,151,526, was likewise granted August 24, 1915, to the same inventors for an improvement in yeast-saving composition for use in bread making.

It is charged that the defendant company at its Hazleton plant used in bread making a composition put upon the market and sold to the

trade by the Beyers Company of Cleveland, Ohio, known as "Beyer's Yeast Food," and that this yeast food embodied the formula set forth, in plaintiff's composition patent, and in the manner infringed both of the plaintiff's patents.

That defendant has been using in bread making at its plant the yeast food, as charged, is admitted. In fact, the Beyers Company has been present at the trial and assisted in the defense against the charge of infringement; hence the essential question remaining is whether the use of the Beyer's yeast food makes defendant liable to plaintiff's charge.

Upon analysis the Beyer's product was found to contain ammonium chloride, calcium sulphate, and potassium bromate, together with a filler, which it will be noted contains the very ingredients claimed to be used in the composition patent, viz.:

(1) "A new composition of matter for use, associated with yeast, in the making of leavened bread, flour containing in admixture therewith ammonium chloride, calcium sulphate and potassium bromate, substantially as described."

And in using this composition in bread making embodying potassium bromate, said to be an innocuous oxidizing bromin compound, plaintiff's process patent is said to be also violated in its privileges claimed under its five claims, of which the following has the greatest breadth:

(1) "The process of making leavened bread, which comprises incorporating an appropriate and innocuous oxidizing bromin compound with the yeast, flour and other ingredients of the dough batch, and fermenting the batch, substantially as described."

The controversy hinges around the right to use potassium bromate and its equivalent, if any, in yeast fermentation and bread making.

Claim 2 of the patent defines the material used as an innocuous alkali metal salt, etc., and claim 4 specifically specifies potassium bromate as the salt used, and claim 5 defines the proportion of the salt and the flour which has been found by the inventors to be the quantity which gives the maximum result.

Disclaimer is entered in the composition patent to the employment of ammonium chlorid and calcium sulphate, either alone or together, in the manufacture of leavened bread, inasmuch as the use of these materials is not recognized as the result of the joint efforts of the inventors. It is to the use of potassium bromate, either alone or in conjunction with the salts named, that the patentees claim exclusive privileges in yeast composition and bread making for discoveries made in the use thereof.

[1] That useful results are actually obtained in the use of these chemicals, as indicated in the specifications of the patents, is not questioned by the defendant. Indeed, defendant, being a user of them and striving to continue in the use thereof, is not in a position to dispute the utility thereof. Nor has the statement of plaintiff's breadmaking expert, Dr. Bacon, been denied where he, in his testimony, speaking of the uses of the chemicals, said:

"The composition is used in the manner described in the patent; that is, it is added usually to the other ingredients of the dough batch right at the start of the bread-making process and it is used either to do one of two things

—either to save yeast and obtain a certain conservation of food material, such as flour, sugar, etc., or it may be used to shorten the time of fermentation with a quantity of yeast, and at the same time to effect certain savings in flour, sugar and other material. It is found also that by the use of the material of this kind the whole process of fermentation of the dough is more easily controlled, put in better condition, and the general result is easy control of the bakeshop and a better loaf of bread—better in color, flavor, bloom, texture, etc."

[2, 3] The defendant attacks the validity of both patents on the grounds that they are lacking invention and novelty. The burden of disproving validity rests with those preferring the charge. The grant of the patents carries with them the presumption of their validity. The prima facie of validity is so strong that the burden of proof upon a defendant to establish defenses that attack the validity of a patent is the same as that upon the prosecution in a criminal case. Courts are not permitted, therefore, to constitute themselves into a board of reviewing examiners and on nicely balanced considerations find that the patent office examiners were in error. The grant of the patent carriers with it the respect due a contract made on behalf of the government by those expert and authorized to act for it in honesty and good faith, and unless proof is forthcoming carrying conviction beyond reasonable doubt to the contrary, its validity will not be impeached. In the light of these observations, the charge of invalidity must be met. As to the defense of anticipation, the defendant shows no prior use of potassium bromate in either yeast growing or bread making, but sets up that potassium bromate belongs to the class of chemical substances known as oxidizers, and that the use of oxidizing substances in yeast growing and bread making is old. The important citations by defendant from the prior art relating to the use of oxidizers in yeast growing or bread making were the translations from Comptes-Rendua, vol. 138, January—June, 1904, entitled, "The Action of Oxidizing on the Purity of Industrial Fermentation," and the Jago and Chitty British patent. The former relates to the use of certain oxidizing salts as a germicidal to kill foreign bacteria and pathogenic microbes in the growing of yeast in a liquid mash and fermentation ranging from two to four days. It will be seen that the purpose sought by Alliot and Gimmel to be accomplished and the means to this end were wholly different from the use by the patentees of potassium bromate in bread making which is accomplished by use of a dough mass passing through a stage of fermentation lasting not longer than five or six hours; and this is evidenced from the successful use by the French experimenters of chlorate of potassium, perchlorate of potassium, and bichromate of potassium salts, which the uncontroverted testimony of Dr. Charles Hoffman, who has largely experimented in the use of these and other salts in bread making, shows have no advantage in the art.

The British patent is for increasing the strength of the flour through treatment with calcium acid phosphate and other minerals. The patent discloses "that the presence in dough of a small quantity of certain salts which belong to the class of those containing loosely combined oxygen materially improves and increases the property known to bakers as 'strength,'" designating these salts as "persulphates," of which

potassium persulphate was employed with success, advising also that "other salts of acids containing loosely combined oxygen may be employed, such as the perborates and the perphosphates or suitable salts containing hydrogen peroxide of the crystallization." It is argued that as these salts and likewise potassium bromate belong to what is known in chemistry as the haloid group, the use of the latter in bread making is but a substitution and equivalent of chemicals of the same group which has been used for the same purpose, with the same effect in view and with the same result, and thereby negative novelty. There is no fault found with the reasoning of the able counsel other than that he goes without the proof as established by the evidence. It has no doubt been made to appear by comparison of the use of persulphates in bread making with bromates that most, if not all, the differences exist as set forth by plaintiff's counsel, viz.:

"The persulphates give off their oxygen in the dough, whereas the bromate gives off the majority of its oxygen in the oven. The persulphates are used in quantities of from three to four times the amount of bromates used, or which can be used. The potassium bromate softens hard flours; the persulphates tighten the flour. Malt extract as an aid to the softening of hard flour is desired, whereas this is not necessary with potassium bromate. The persulphates contain loosely combined oxygen; the bromates contain tightly combined oxygen; potassium bromate saves about 30 per cent. of the yeast ordinarily used in bread making by stimulating the enzymes of a smaller amount of yeast during the time that the ammonium and calcium salts are building up a larger quantity of yeast in the dough. The bromates stimulate the proteolytic enzymes of the yeast, which enzymes in turn mature the gluten into an elastic form and into a condition to hold the gas, otherwise it would take more yeast in the full period of fermentation to obtain an efficient gluten maturing result."

An equivalent has been defined as a thing which works in substantially the same way to accomplish the same results, and perform the same functions as the thing for which it is substituted. It cannot be said from the comparison observed between the uses made of the oxidizing persulphates and bromate that the effects produced are the same as applied to the same subject-matter and thus constitute chemical equivalents. And for the same distinguishing results in the comparisons made between the uses, if the chemicals mentioned should be regarded as substitutions, there being new properties and results developed in the art of bread making, it cannot be said that such results would have been obvious to those skilled in the art of bread making. In the substitution of fusil oil for alcohol as a solvent of camphor in conjunction with nitrocellulose in the manufacture of pynoxyline, thereby giving a better result than the menstruum previously used, and at less expense, the court said:

"The fact that alcohol has been used for many years as a menstruum, when a cheaper solvent could have been used, and would have been, if the availability of fusil oil as a substitute had been obvious to those skilled in the art, is inconsistent with the suggestion that nothing but the mere exercise of judgment was involved in selecting it as a substitute." Celluloid Co. v. Amer. Zylonite Co. (C. C.) 35 Fed. 301.

The art of bread making has its inception remote in the life and economy of the human race and since, until recently, a large and pros-

perous business has been built up in the sale of a yeast food, of which the principal ingredient consists of potassium bromate, over which the warring parties are contending, it may be safely assumed that if the availability of this chemical and its use have been within the easy reach of those skilled in the art, it would ·have been long before brought to aid in the control of the bakeshop and a "better loaf of bread in color, flavor, bloom and texture" by those faithfully and constantly striving to meet the public demand.

[4] Nor can it be said that the properties forming plaintiff's and defendant's yeast food respectively, known as ˌArkady and Beyers, covered by the composition patent, are an aggregation. If the combination produces new and useful results by reason of the several combined elements and not only the aggregate of the distinct several, it will not be so designated. National Cash Register Co. v. American Cash Register Co., 53 Fed. 367, 3 C. C. A. 559; National Hollow Brake Beam Co. v. Interchangeable Brake Beam Co., 106 Fed. 693, 45 C. C. A. 544.

It is claimed·for the combination of ammonium chloride, calcium sulphate, and potassium bromate salts, when mixed with the dough, that their action is not only a conjoint action from the standpoint of yeast saving and conservation, but the purpose for which the ammoniums and calciums are added is aided by the addition of the potassium bromate.

The evidence of witnesses learned and experienced in the chemistry of bread making, who are hardly opposed by any evidence of the character, shows that the result accomplished by the composition is more than the sum of the results of the individual chemicals. Each of the salts ·put into the dough batch, it is said, enter, separately and in combination, into the chemical and biological processes going on in the maturing of dough. The calcium and ammonium salts produce new yeast growth, and the potassium bromate stimulates the proteolytic activity of a similar number of yeast enzymes in the full·period of fermentation, to the end that the gluten is matured and rendered into con- dition to hold the gas at the same time that the yeast is being developed and made ready for the oven.

Whether the patentees understood and correctly explained the biological operations of their combinations or the action of potassium bromate in the fermentation and preparation of the dough for the baking is not as important as to whether they added by their efforts a new and useful article and improvement to the world's utilities. As it was said in Diamond Rubber Co. v. Consol. Tire Co., 220 U. S. 435, 31 Sup. Ct. 447, 55 L. Ed. 527:

"How can it take from his merit that he may not know all the forces which he has brought into operation? It is certainly not necessary that he understand or be able to state the scientific principles underlying his invention, and it is immaterial whether he can stand a successful examination as to the speculative ideas involved." Andrews v. Cross (C. C.) 8 Fed. 269; Eames v. Andrews, 122 U. S. 40, 7 Sup. Ct. 1073, 30 L. Ed. 1064; Dixon-Woods Co. v. Pfeifer, 55 Fed. 390, 5 C. C. A. 148; Cleveland Foundry Co v. Detroit Vapor Stove Co., 131 Fed. 853, 68 C. C. A. 233; Westmorland ˌSpecialty Co. v. Hogan, 167 Fed. 327, 93 C. C. A. 31; Westinghouse Elec. Mfg. Co. v. Montgomery E. L. & P. Co., 153 Fed. 901, 82 C. C. A. 636.

The defense of prior use by Beyer at the several bakeries where employed, as well as the alleged use by Hoffman, at the General Baking Company's plant at Williamsburg, in view of all the evidence of the case and want of substantial corroboration, does not rise to the proof necessary to overcome the prima facies favoring the patents.

It follows that plaintiff's bill will be sustained, and a decree may be presented in accordance therewith.